

**ORIGINAL**

ROBERT H. SPERGEL, ESQ. (RS-9007)
320 Old Country Road, Suite 105
Garden City, New York 11530
516-535-4311

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------X
JENNIFER BARNA and JENNIFER HORN

               Plaintiffs',

   -against-

SPECTRUM COMMUNITIES; WCI COMMUNITIES
(as parent Company and/or successor
company); WCI/SPECTRUM COMMUNITIES
(as parent Company and/or successor
Company),MITCHELL HOCHBERG; CHRISTOPHER
DeTHOMAS; RODNEY MONTAG and GABE PASQUALE

              Defendants'.
- - - - - - - - - - - - - - - - -X

**ECF**

DOCKET No:

<u>**VERIFIED COMPLAINT**</u>

**PLAINTIFFS DEMAND**
**A TRIAL BY JURY**

**05 CIV 2 176**

**BRIEANT**

Plaintiffs', JENNIFER BARNA and JENNIFER HORN by and through

their attorney ROBERT H. SPERGEL, complaining of the defendants'

SPECTRUM COMMUNITIES; WCI COMMUNITIES (as parent Company and/or

successor company); WCI/SPECTRUM COMMUNITIES(as parent Company

and/or successor Company); MITCHELL HOCHBERG; CHRISTOPHER

DeTHOMAS; RODNEY MONTAG and GABE PASQUALE sued herein

individually and collectively, respectfully alleges as follows:

        **STATEMENT PURSUANT TO LOCAL RULE 9**

     1. For the purposes of complying with Local Rule 9,

the Plaintiffs= state that they have no corporate parent,

*(PLACE AN  x  IN ONE BOX ONLY)*                          **ORIGIN**

☒ 1 Original    ☐ 2 Removed from    ☐ 3 Remanded from    ☐ 4 Reinstated or    ☐ 5 Transferred from    ☐ 6 Multidistrict    ☐ 7 Appeal to District
Proceeding      State Court      Appellate Court      Reopened      (Specify District)      Litigation      Judge from Magistrate Judge Judgment

---

*(PLACE AN  x  IN ONE BOX ONLY)*     **BASIS OF JURISDICTION**     *IF DIVERSITY, INDICATE CITIZENSHIP BELOW.*

☐ 1 U.S. PLAINTIFF    ☐ 2 U.S. DEFENDANT    ☒ 3 FEDERAL QUESTION (U.S. NOT A PARTY)    ☐ 4 DIVERSITY    *(28 USC 1332, 1441)*

---

### CITIZENSHIP OF PRINCIPAL PARTIES (FOR DIVERSITY CASES ONLY)

(Place an [X] in one box for Plaintiff and one box for Defendant)

|  | PTF DEF |  | PTF DEF |  | PTF DEF |
|---|---|---|---|---|---|
| CITIZEN OF THIS STATE | [ ] 1  [ ] 1 | CITIZEN OR SUBJECT OF A FOREIGN COUNTRY | [ ] 3  [ ] 3 | INCORPORATED _and_ PRINCIPAL PLACE OF BUSINESS IN ANOTHER STATE | [ ] 5  [ ] 5 |
| CITIZEN OF ANOTHER STATE | [ ] 2  [ ] 2 | INCORPORATED _or_ PRINCIPAL PLACE OF BUSINESS IN THIS STATE | [ ] 4  [ ] 4 | FOREIGN NATION | [ ] 6  [ ] 6 |

---

PLAINTIFF(S) ADDRESS(ES) AND COUNTY(IES)

JENNIFER BARNA
48 WINDMILL LANE
NEW CITY, NEW YORK 10956

JENNIFER HORN
409 CEDAR AVENUE
UPPER NYAK, NEW YORK 10960

---

DEFENDANT(S) ADDRESS(ES) AND COUNTY(IES)

SEE ATTACHED

---

DEFENDANT(S) ADDRESS UNKNOWN
    REPRESENTATION IS HEREBY MADE THAT, AT THIS TIME, I HAVE BEEN UNABLE, WITH REASONABLE DILIGENCE, TO ASCERTAIN THE RESIDENCE ADDRESSES OF THE FOLLOWING DEFENDANTS:

---

Check one:    THIS ACTION SHOULD BE ASSIGNED TO:    ☒ WHITE PLAINS      ☐ FOLEY SQUARE
            (DO NOT check either box if this a PRISONER PETITION.)

| DATE | SIGNATURE OF ATTORNEY OF RECORD | ADMITTED TO PRACTICE IN THIS DISTRICT |
|---|---|---|
|  |  | [ ] NO |
|  |  | [x] YES (DATE ADMITTED Mo. _____ Yr. _1997_ ) |
| RECEIPT # |  | Attorney Bar Code # 9007 |

Magistrate Judge is to be designated by the Clerk of the Court.

Magistrate Judge _____ is so Designated.

J Michael McMahon, Clerk of Court by _____ Deputy Clerk, DATED _____.

---

UNITED STATES DISTRICT COURT (NEW YORK SOUTHERN)

subsidiary or affiliate, and that there are no other interested parties.

## NATURE OF CLAIM

2. This is an action for damages against the Defendant(s) to redress the deprivation of rights secured to Plaintiffs under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000(e) et seq., and New York State Executive Law 296 and 297, as and for the sex discrimination of the Plaintiffs by the Defendant(s), the creation of a hostile work environment and for the retaliation as against the plaintiffs for protesting such illegal and improper conduct.

## JURISDICTION AND VENUE

3. Plaintiffs invoke this Courts jurisdiction over their Federal causes of action pursuant to 42 U.S.C. ' 2000 e-5(f). This Court has pendent jurisdiction over Plaintiffs causes of action arising under New York State Executive Law ' 290. Plaintiffs Federal and State claims arise from the same nucleus of operative facts. See, 28 U.S.C. § 1367

4. Upon information and belief, the defendants SPECTRUM COMMUNITIES and WCI/SPECTRUM COMMUNITIES, are corporations formed under the laws of the State of New York, and licensed to do business in the State of New York, and are doing business at 115

Stevens Avenue, Valhalla, New York 10595. Therefore, under 42 U.S.C. § 2000e-5(f)(3), this Court has jurisdiction over this matter.

5. Upon information and belief, Defendant Mitchell Hochberg, is a Manager with a title of President at SPECTRUM COMMUNITIES and/or WCI/SPECTRUM COMMUNITIES, and is being sued herein, as an aider and abetter. Therefore, under New York State Executive Law § 296(6) this Court has jurisdiction over the individual.

6. Upon Information and belief, Defendant Christopher DeThomas, is a Manager with a title of Vice President at SPECTRUM COMMUNITIES and/or WCI/SPECTRUM COMMUNITIES, and is being sued herein, as an aider and abetter. Therefore, under New York State Executive Law § 296(6), this Court has jurisdiction over the individual.

7. Upon Information and belief, Defendant Rodney Montag, is a Manager with a title of Vice President at SPECTRUM COMMUNITIES and/or WCI/SPECTRUM COMMUNITIES, and is being sued herein, as an aider and abetter. Therefore, under New York State Executive Law § 296(6), this Court has jurisdiction over the individual.

8.   Upon   Information   and   belief,   Defendant   Gabe Pasquale, is a Manager with a title of Chief Marketing Officer at SPECTRUM COMMUNITIES and/or WCI/SPECTRUM COMMUNITIES, and is being sued herein, as an aider and abetter. Therefore, under New York State Executive Law § 296(6), this Court has jurisdiction over the individual.

9.   The   unlawful   employment   practice   alleged   below occurred within Westchester County, in the State of New York. Accordingly, venue lies in the United States District Court for the Southern District of New York under 42 U.S.C. § 2000e-5(f)(3).

10. On or about June 14, 2004, Plaintiff Jennifer Barna timely filed a Charge of Discrimination with the Equal Employment Opportunity Commission (EEOC) and the New York State Division of Human Rights (NYSDHR). On or about November 30, 2004, the EEOC issued her a Right to Sue Letter.

11.      On   or   about   June   14,   2004,   Plaintiff Jennifer Horn timely filed a Charge of Discrimination with the Equal Employment Opportunity Commission (EEOC) and the New York State Division of Human Rights(NYSDHR). On or about November 30, 2004,the EEOC issued her a Right to Sue Letter.

**THE PARTIES**

12.   Plaintiff, Jennifer Barna("Barna"), is and was a resident of the State of New York, at the time of the occurrence plaintiff resided at 48 Windmill Lane, New City, New York 10956.. Plaintiff all times relevant herein, was employed by the Defendants from in or about November 23, 2000, until she was constructively discharged on or about March 31, 2004.

13.   Plaintiff, Jennifer Horn("Horn"), is and was a resident of the State of New York, at the time of the occurrence plaintiff resided at 409  Cedar Avenue, Upper Nyack, New York 10960. Plaintiff all times relevant herein, was employed by the Defendants from in or about November 9, 2000, until she was constructively discharged on or about January 30, 2004.

14. Upon information and belief, Defendant, Spectrum Communities was and still is a Corporation employing fifteen (15) or more persons, and maintains its principal office for the transaction of business at 115 Stevens Avenue, Valhalla, New York 10595.

15.   Upon information and belief, the Corporation is and was at all times relevant hereto an "employer" as defined under Title VII 42 U.S.C. 2000(e) and the Executive Law.

16. Upon information and belief, Defendant,

WCI/Spectrum Communities was and still is a Corporation employing fifteen (15) or more persons, and maintains its principal office for the transaction of business at 115 Stevens Avenue, Valhalla, New York 10595.

17.     Upon information and belief, the Corporation is and was at all times relevant hereto an "employer" as defined under Title VII 42 U.S.C. 2000(e) and the Executive Law.

18. Upon information and belief, Defendant, WCI was and still is a Corporation employing fifteen (15) or more persons, and maintains its principal office for the transaction of business within the State of New York at 115 Stevens Avenue, Valhalla, New York 10595.

19. Upon information and belief, the Corporation is and was at all times relevant hereto an "employer" as defined under Title VII 42 U.S.C. 2000(e) and the Executive Law.

20. Upon information and belief, the Defendant, Mitchell Hochberg is a male citizen of the United States and resides within the State of New York.

21. Upon information and belief, Defendant Mitchell Hochberg functioned in a supervisory capacity as to plaintiffs' Barna and Horn.

22. Upon information and belief, the Defendant, Christopher DeThomas, is a male citizen of the United States and resides within the State of New York.

23. Upon information and belief, Defendant Christopher DeThomas functioned in a supervisory capacity as to plaintiff's Barna.

24. Upon information and belief, the Defendant, Rodney Montag, is a male citizen of the United States and resides within the State of New York.

25. Upon information and belief, Defendant Rodney Montag functioned in a supervisory capacity as to plaintiff's Horn.

26. Upon information and belief, the Defendant, Gabe Pasquale, is a male citizen of the United States and resides within the State of New York.

27. Upon information and belief, Defendant Gabe Pasquale functioned in a supervisory capacity as to plaintiff's Horn.

## STATEMENT OF FACTS
## PLAINTIFF BARNA

28. Plaintiff Barna began her employment on or about November 23, 2000. Her employment ended on or about March 31,

2004, when she was informed via letter that her position would not be held despite the fact that she was unable to work due to the continued and unabated harassment and abuse from Chris DeThomas. Other supervisors who participated in harassment of Barna included Rodney Montag. Despite repeated complaints, no action was taken to prevent this continued conduct, which made her employment unbearable. It was not until after Barna broke down in tears, gave two weeks notice and contacted an attorney that Spectrum formally started an alleged investigation by Jeffrey Englander.

29.     Surprisingly, despite this alleged ongoing investigation of sexual harassment being conducted by Mr. Englander on behalf of Spectrum, Spectrum reported to The New York State Unemployment Division that Barna's claims had already been investigated and were unfounded.

30.     During the tenure of Barna's employment she was repeatedly subjected to verbal and threatening harassment. She has been humiliated and degraded by her supervisor, Chris DeThomas.

31.     As was the habit of Chris DeThomas, he offered to help Barna  progress in the company if she treated him as he wanted sexually. The perverse atmosphere at Spectrum was well

known as most, if not all Vice Presidents, including DeThomas, were aware of and ignored, or participated in sexual harassment directed not only at Barna, but other female employees of Spectrum.

32.   Prior to June 23, 2003, Barna's relationship with Chris DeThomas had been a working relationship. However, after a company baseball game on June 18, 2003 at Yankee stadium, his attitude toward her changed.

33.   After receiving an email from DeThomas on June 23, 2003, Barna became extremely upset and was caused to cry. She went to the Human Resources "HR" department and spoke to Greg Longin. At that time Barna explained that her situation with DeThomas was progressively getting worse.  Barna told Longin that she had been having trouble with DeThomas and that he would not talk to her because she was not responding positively to his sexual suggestions and his perverse way of treating women. Longin told Barna that a situation had occurred at the Yankee Game and that the VP's of Spectrum were going through a rough time and that she should try and let time pass and maybe things would get better. As nothing in Spectrum is kept a secret Barna believed that he was referring to the fact that a female employee, Maria

Cassell, had been sexually touched by a few Spectrum employees at the Yankee game.

34. By September 2003, Barna's work relationship with DeThomas had not improved. By this time, Barna had already gone to "HR" a few times and advised Longin what was going on. Despite these complaints, nothing was done. Between September and December 2003 Barna again went to Longin on a number of occasions with complaints of misconduct concerning DeThomas. These complaints included, but are not limited to:

- Sept 5, 2003, DeThomas sent Barna an email on how incredible she looked.

- Sept 20, 2003 was Barna's birthday and he gave Barna a card with sexual overtures concerning female body parts.

- DeThomas kept telling Barna he wished she was not his assistant; based upon his continued conduct toward her she believed that to mean he wanted to have sex with her.

- DeThomas told Barna that he and Mike Dignacco had a conversation about her and that he could not tell her about it but that he was glad he was not the only one who felt a certain way about her.

- DeThomas would tell Barna repeatedly that he had sex dreams about her.

- DeThomas told Barna that he was watching a porn movie and that he imagined that she looked like this porn star from the neck down.

- DeThomas would comment on Barna's pants and tell her which were his favorites and make growling noises at her.

- DeThomas would comment to Barna that when she wore baggy pants he would tell her that he did not like her in baggy pants.

- DeThomas would comment on certain shirts that Barna wore.

- DeThomas offered Barna breast-shaped "tit-tac" candy.

- DeThomas would call Barna over to his desk while he was sitting behind it and tell her he had no pants on.

- DeThomas would call Barna over to help him with his computer and tell her "watch out little girl."

- If Barna made an error at work, DeThomas would call her into his office and tell her she needed to be spanked.

- Another Vice President, Rodney Montag, told Barna that her breasts looked very big in certain shirts.

- Rodney Montag told Horn on June 21, 2001 after a VIP event that, "I finally got my 24 year old girlfriend (referring to Beth Stacey) to the bar and she shows up engaged that slut." He then told Horn that, " I am going to plan #2,

Jennifer Barna"

- Rodney Montag bragged at a Senior Staff meeting that he could have sex with Barna if he wanted. Barna was told this by DeThomas.

- Chris DeThomas told Barna that Rodney Montag told other Vice Presidents that at the Yankee Game on the bus ride home he sat next to Barna and touched her underwear and that his assumptions were true that he could have sex with her if he wanted to. DeThomas yelled at Barna and caused her to cry about this and she told him this was not true.

- DeThomas would ask Barna to file papers in front of his office on days that she wore his "Favorite pants."

- DeThomas would tell Barna that he was really good at performing oral sex on women. (He would refer to it as "going down.")

- At project meetings, DeThomas would sit next to Barna and take off his shoes and start rubbing her leg with his foot.

- DeThomas would go around the corners at work and attempt to bump into Barna. He would then tell Barna that he wished his hands were up.

- DeThomas once came into Barna's office when she was talking to Jennifer Horn, a co-worker, and pulled her shirt forward to look down it.

- DeThomas once grabbed Barna and licked her arm as he walked by. This happened as Barna was talking to a co-worker, Samantha Castrignano. Barna observed him on other occasions also licking Samantha. Barna also was aware that he had licked another co-worker, Dirce Fornelos.

- DeThomas left a letter on Barna's chair on Christmas Eve 2003 as he previously told her at the Christmas party the fact that he had a "pretty big crush on me" (referring to Barna) as he told her at the Christmas party. He mentioned to Barna that Steve Gold (another employee) knew about the crush. He also stated that, "it has been hard for me to keep it quiet, especially in the face of this years' Yankee Game when I became very jealous." He also wrote in a letter to Barna that, he "cannot suppress his feelings any longer" and "It's not a cheap one-time sex thing" that he was looking for.

    35. Prior to December of 2003 Chris DeThomas repeatedly told Barna that he had something to tell her but that he had to be drunk in order to tell her. He referred to Barna as being a

scaredy cat anyway and maybe he would not tell her. It was obvious to Barna by his behavior in the past that this meant he wanted to have sex with her. At the Christmas party on December 15th 2003, Chris DeThomas finally told Barna this "secret" – that he had a major crush on her.

36. In or about December 2003, DeThomas asked Barna if she would like him to take her out to dinner in New York City. Barna told him she would think about it, and that it sounded okay. On December 19, 2003 DeThomas sent her an email and said he wanted to take her to dinner on December 30, 2003. Barna knew from conversations they had at the company Christmas party and what had been happening over the last few months that she did not want to put herself in a position to be alone with him where he would try and make a sexual move towards her. Barna told him she would think about it, and weigh the benefits of going alone or with others. She believed that it was best to appease him because of his jealous tendencies and find an excuse not to go alone. Barna did not know how to say no without making DeThomas really mad. Barna felt alone and trapped because DeThomas was her supervisor, a Vice President in the company and that this was her job and she did not know how to deal with this kind of situation. Although Longin had been aware of the situation from June, and of

other situations, nothing was ever done to help Barna. Subsequently on December 23, 2003 Barna spoke to DeThomas about going out and told him she did not feel comfortable with the situation and she did not want to go out alone with him.

37. His response at that time was to tell Barna that the situation between them was his fault because he had believed that Barna could handle things that he had been telling her. He told Barna that she should have taken him seriously concerning conversations about his dreams of her. He admitted to Barna that his feelings and ego were bruised because Barna would not go out with him. Sometime after December 23, 2003, DeThomas admitted to Barna that he could not help getting jealous and moody.

38. On January 2, 2004, Barna was wearing an Abercrombie t-shirt that had the #61 on it. DeThomas kept referencing all day how he wanted to "tackle" her. He then kept asking Barna about the #61 and what significance it had to her. He left a note on Barna's car that said "69 huh??????" Also on January 2, 2004, DeThomas told Barna how she looked like Tawny Kitaen, who he referred to as a hot actress. He also sent Barna an email that same day that stated Barna needed to be careful, "as he may suffer a flashback from his football days and have the sudden urge to tackle me," in reference to Barna.

39. On January 8, 2004 Barna received her year end review. DeThomas had written in her comments that being an assistant would hold her back financially and that if she had goals that Barna wanted to meet then she should let him know and he could help Barna grow. Based upon his prior conduct toward her, Barna believed he was referencing that he wanted her to have sex with him to move forward in the company. When Barna discussed this with him, he told her that she was a woman and that since she may become pregnant and leave why would it benefit him to help her. His motive was clear, as another younger female employee of Spectrum, Samantha, was involved in a sexual relationship with DeThomas at that time, and was getting a raise.

40. Barna again went to "HR" and spoke to Longin. She once again asked him to intervene concerning DeThomas. Longin was told about the comments concerning women and Barna's review. In addition, Barna also complained to Kevin McManus, another Vice President and Barna's Direct Supervisor about DeThomas' behavior.

41. Toward the end of Barna's employment, (January-February) despite allegedly being spoken to by Longin, who was the HR director, DeThomas was still making comments to Barna and forwarding emails to her. At that time, DeThomas began to make Barna's work environment even harder by not giving her work to do

and changing rules which only applied to her. DeThomas also forwarded Barna an email calling her a prude and too conservative.

42. In January 2003 Barna had a meeting with Mitchell Hochberg, the President and Beth Stacy, an Administrative Assistant about the March of Dimes fund raiser. When they sat down at the meeting, Mitchell thanked them and asked if Barna had the time to do this. Barna replied that she did and that she needed help, and that is why she asked Beth. He then asked Barna, "Was Chris okay with this? He seems to get very jealous over you." Based upon those comments Barna had hoped that her complaints may have been addressed by Greg or Kevin. Unfortunately Barna received no further assistance or help.

43. Barna again went to Longin and told him that DeThomas was capable of ruining this company by his actions with women. She told Longin that it was impossible for her to work with DeThomas under these circumstances and that he repeatedly made her cry because of how rude he was being and that she did not want to cause any problems in the company, however she really needed his help. She told him she would have to leave the company if nothing was done. Longin told Barna that he would try and locate another position in the company for her and although he

only had 50% of the story he could gather the other 50% on his own and that he understood that her concerns were real ones. Still, nothing was done.

44. A few days after going to Longin again, DeThomas and Barna had a conversation. At that time, he pulled Barna in his office and yelled at her because she had been speaking to another Vice President, Gabe Pasquale about something work related. DeThomas then told Barna he does not know what is going on, but that she chose not to take heed of his advice. He then told Barna that he can lead a horse to water but that she can choose to drink it or not and that if she did not listen to him she would no longer work for him and that was that. Barna left and was forced to tears. Barna again went to Longin and told him DeThomas had threatened her job because of his jealousy of her talking to Gabe. Barna explained to Longin that he did not fully understand how bad it was and she could not wait for a solution, she needed intervention immediately.

45. A few days later, Longin came to Barna's cubicle to ask her something. Almost immediately, DeThomas called Barna on her phone and said he needed Barna right away. Barna told Longin she had to go. At that point DeThomas called Longin over to his

desk. DeThomas then asked Longin what he wanted with Barna and told Longin he better be careful and that he was watching him.

46. Barna now hoped that this obsessive behavior would show Longin how awful it was for her, that no one could talk to her, because DeThomas would get jealous and angry. Barna immedialtley emailed Longin apologizing for DeThomas' behavior and told him he has no idea how serious DeThomas was being. Barna then told Longin that she was back to writing DeThomas a letter telling him she wanted to grow as an attempt to get out of the position without DeThomas getting upset and jealous because she did not know what else to do. Barna asked Longin to review, Longin did and then sent it back to Barna stating he, "Softented the tone a little bit".

47. DeThomas' behavior toward Barna got worse as he knew Barna was becoming more vocal in her complaints as she could no longer take it emotionally and physically. As work would come in Barna would place it on DeThomas' plan table as she was supposed to. At one point DeThomas asked Barna to get certain material from his pile of work. When Barna looked in the folder in his pile, she found pornographic material.

48. DeThomas' behavior continued to get worse as Barna refused to give in and was continuously asking for help from

Page -19-

Longin. DeThomas would come to her office and literally throw papers on Barna's desk as she worked. He excluded Barna from a Project Manager meeting that she had worked very hard to prepare for and excluded her from a project meeting that she had been attending every Tuesday for approximately two years.

49. Barna again went to Longin, who explained that DeThomas had been moody to everyone and was going through rough times and that she should bear with it. Barna told Longin that there are a lot of issues with DeThomas and that he needed to understand that DeThomas is delusional and that he needed to help her immediately. No one came to her aid and Barna was left to deal with DeThomas alone.

50. On Thursday February 26 Barna went to Longin and asked him if she could take an emergency day off. She told him that if she were anyone else like Sarah Troy, she would have sued them already for the same thing because of what DeThomas was doing. At that point, to her surprise, Longin responded that because of that comment concerning Ms. Troy, he needed to take off his "friend" hat and put on his "HR" hat. Barna told Longin that she did not want to cause problems, however she was a victim and that he had to help her. Barna further told him she was going

to snap emotionally if he did not handle the situation and that she would have to quit.

51. On February 27 Barna emailed Kevin McManus, another Vice President and her supervisor, to see if he spoke to Chris DeThomas. Kevin McManus told Barna that he had not; however, he had spoken to Mitchell Hochberg (President) and Andrew Stark (Senior Vice President and Legal Counsel). He told Barna to come in on Monday and they would work it out. Barna thought this would help - however, nothing positive ever happened.

52. On March 1, 2004 Barna returned to work despite being upset and not sure if anything was being done to help her. To her surprise, DeThomas sent her an email telling her to come up with a game plan that works for the both of them. This continued working with DeThomas however was not acceptable anymore.

53. When Barna went to speak to DeThomas, he again threatened her job by telling her that if he (DeThomas) went to Mitchell and told him she needed a transfer that Mitchell would fire her.

54. Kevin McManus tried to help. On March 3, 2004, he took Barna out of the office to discuss a position he had for her, however, DeThomas would not let her go. Again on March 8,

2004, Barna went to Longin for help, who again told Barna to give it time.

55. On March 11, 2004, Barna again went to Longin hysterically and in tears and told him how she have been trying for so long to get help and no one would do anything. Barna had no choice but to give her two week notice. At that time Gregory Longin and Kevin McManus asked her to reconsider and that they would move her desk away from Chris DeThomas. Barna told them she would need time to think about it, but that she needed more than just her desk moved. After Barna sought legal counsel, Spectrum for the first time offered to conduct an alleged investigation to be conducted by Jeff Englander. Despite communications between Barna's former counsel and Spectrum and emails she sent asking them for time off explaining that her intentions were to file for FMLA due to her mental and physical health conditions caused by the harassment, Barna was terminated on March 31, 2004 for allegedly failing to respond to Spectrum's letters. This was untrue. Moreover, based upon a letter received from the New York State Division of Unemployment, Spectrum had protested Barna's application for unemployment and stated Barna was terminated for cause after an investigation.

56. In addition, Barna has been aware of other females who have been sexually harassed on an ongoing basis by supervisors of Spectrum. These females include, but are not limited to, Jennifer Horn, Dirce Fornelos, Maryanne Gunning, and Maria Cassell. In addition, it is Barna's understanding that a former female employee, Ms. Troy, had previously accused Mr. DeThomas of misconduct.

### STATEMENT OF FACTS
### PLAINTIFF HORN

57. Plaintiff Horn began her employment on or about November 9, 2000. Her employment ended on or about January 30, 2004 when she was constructively discharged and had no choice but to resign from her position as she was unable to emotionally handle the continued sexual harassment, demeaning behavior toward women, and lack of confidentiality. She underwent an exit interview with Human Resources at that time and reiterated her complaints, however, like in the case of Barna, her complaints were never acted upon.

58. During the tenure of her employment Horn has repeatedly been subjected to verbal and physical harassment. Like Barna, she was targeted and then humiliated and degraded by male supervisors including Chris DeThomas, Rodney Montag, Gabe Pasquale, and the President of Spectrum, Mitchell Hochberg. Horn

has been subjected to viewing the nude picture of a former female employee which was being circulated. Despite having notified supervisors of this offensive and degrading conduct, nothing was done. In fact, the picture was circulated through the companies email system.

Some of the forms of sexual harassment include but is not limited to the following:

- May 29, 2001 at the Trump National broker event, Chris DeThomas, a Vice President, grabbed Horn's butt.

- May 2001, Horn received an email from Steven Gold telling her that it was too bad he was married, but that it did not matter at Spectrum anyway.

- June 11, 2001 Gabe Pasquale, a Vice President, told a story concerning women's breasts while standing outside Horn's work area.

- June 13, 2001, Chris DeThomas refused to get out of Horn's way which forced Horn to squeeze past him, at which time he looked her up and down slowly.

- June 20, 2001, Gabe Pasquale pressed his genitals into Horn's hip.

- July 3, 2001, Gabe Pasquale told Horn and her co-worker Beth Stacy that he was going to "grind" her at the summer party.

- At the summer party, Gabe Pasquale straddled Horn's legs and body and unbuttoned his shirt. He offered to "show me his if I show him mine." He grabbed Horn's hand and forced it onto his chest. During this time he

was told to stop by Horn and Angela Ferrara, a Vice President.

- August 2001, Horn received an email from Chris DeThomas telling her that he wanted to get together with Horn with "a bottle of wine, tonight, my pad. Whattayasay."
- July 2001, Mitchell Hochberg grabbed Horn's butt twice.
- July 18, 2001, Chris DeThomas pressed his erect genitals against Horn's arm.
- August 5, 2001, Chris DeThomas offered Horn some breast-shaped "tit-tac" candy.
- September 14, 2001, Chris DeThomas put his tongue into Horn's ear numerous times
- Prior to November 6, 2001 Horn complained about Joe Kenny, and was told that a letter would be put in his file.
- Prior to November 6, 2001, Chris DeThomas rubbed Horn's back and put his erection up against her butt in front of Angela Ferrara.
- Prior to November 6, 2001 at the Spectrum Boathouse party, Chris DeThomas held Horn back from the rest of the tour group and told her that he wanted to "make-out" with her.
- November 14, 2001, Chris DeThomas gave Horn a back rub and stated that he could not help himself when she wore silk shirts. He then offered to have sex with Horn anytime she wanted.
- January 2002, Gabe Pasquale bear-hugged Horn at the copier machine and Marc Martinez, a Vice President, told him to leave her alone.

- January 17, 2002, Gabe Pasquale asked Horn if I knew what a "teabag" was, then mounted her leg and rested his genitalia on her leg.

- February 2002, Rodney Montag sent Horn a copy of an email that was circulating showing a man with his hand down the panties of a female on a dance floor.

- February 8, 2002 Horn received an email from Chris DeThomas stating that he thought they should meet at the "Admin Clubhouse" to get naked.

- February 18, 2002 Rodney Montag emailed a photo of Britney Spears to Beth Stacy and Horn with comments about her breast size.

- April 25, 2002, Horn received an email from Chris DeThomas stating that he thinks that there is sexual tension between them and that they should have sex to get rid of it.

- June 18, 2002 Chris DeThomas refers to spanking in an email.

- June 19, 2002 Rodney Montag circulated an email to Beth Stacy and Horn with a link to a lewd picture of Britney Spears.

- December 30, 2002, Horn received email from Steven Gold containing a photo of a former female co-employee nude in a hot tub. This picture was circulated throughout the company.

- January 7, 2003 Chris DeThomas emailed Horn stating that he was looking down her shirt while they were in another supervisor's office.

- January 9, 2003 Horn received an email from Gabe Pasquale with a link to a photo of Asian clowns that Horn found insulting as it referred to her as "moonlighting." He referred to them as the dark side of her family.

- March 2003, Chris DeThomas followed Horn into the kitchen and partially unbuttoned her shirt.

- April 2003, after Horn expressed being nervous before a meeting she was to attend, Rodney Montag told her in an email that she should just spread her legs while holding a bottle to relax.

- April 2003, emails circulating from Rodney Montag and his fondness of talking about sex and S & M. Females are referred to as "Divas."

- June 17, 2003, Chris DeThomas emailed Horn asking her whether she liked them to be bitten or lightly licked.

- June 18, 2003, at the company Yankee Game outing, Rodney Montag, then Steve Gold grabbed Horn's breast.

- July 3, 2003, Horn received an email from Rodney Montag concerning watching his dog while he was away. He added in the email that there was a vibrator in the nightstand.

- August 1, 2003, Horn received an email from Gabe Pasquale with a link to a photo of a female breast.

- October 2003, while Horn was in Andrew Stark's office, Chris DeThomas came in and asked her how many men she had had sex with.

- October 2003, Chris DeThomas stood over Horn at her desk, looked down her shirt and told her that he liked the view.
- November 2003, Chris DeThomas pulled Horn aside and held her while she was in the file room.
- November 2003 Chris DeThomas told Horn that he had no pants on while he was sitting at his desk.
- November 2003, at the company sexual harassment meeting Rodney Montag grabbed Horn's breast.
- End of November, 2003, Chris DeThomas pulled Horn's shirt away from her body to look down her shirt in front of Jennifer Barna in her cube.
- December 2003, at the Spectrum Holiday party Chris DeThomas grabbed Horn and tried to kiss her. He told her that they should "French" right there.
- December 2003 Rodney Montag put his arm around Horn and rubbed her back and said he liked the feel of her coat. He then asked Gabe Pasquale and Beth Stacy, "Don't you think Jen would make a great mistress?"
- January 15, 2004, Horn told HR that she wanted to quit. She stated that she had no choice but to quit. She told HR that Jennifer Barna also had been continuously harassed ongoing by Chris DeThomas, and that she had been complaining to supervisors and to HR and nothing was done. HR told Horn that Chris DeThomas had been taking a dive for a long time, but did nothing to offer her any protection.

- January 16, 2004, Chris DeThomas came into Horn's office and told her that since she was leaving the company they could now have sex.

## AS AND FOR A FIRST FEDERAL CAUSE OF ACTION
## FOR SEXUAL HARASSMENT

59. The Plaintiffs repeats and realleges the allegations set forth in paragraphs A 1" through A58" as if more fully set forth herein.

60. The Defendants', SPECTRUM COMMUNITIES; WCI COMMUNITIES (as parent Company and/or successor company) and WCI/SPECTRUM COMMUNITIES (as parent Company and/or successor Company); have discriminated against the Plaintiffs in the terms and conditions of their employment on the basis of sex, in Violation of Title VII of the Civil Rights Act, as amended, 42 U.S.C. 2000 et. seq.

61. By reason of the Defendants unlawful actions, the Plaintiffs are entitled to damages, including but not limited to, lost compensation, lost pay, front pay in an amount to be determined by the court, pain and suffering, emotional distress, and punitive damages in the sum to be determined by a jury, with interest, costs and disbursements; and in addition, attorneys= fees.

## AS AND FOR A SECOND FEDERAL CAUSE OF ACTION
## FOR GENDER DISCRIMINATION AGAINST
### against
**SPECTRUM COMMUNITIES; WCI COMMUNITIES (as parent Company and/or successor company); WCI/SPECTRUM COMMUNITIES(as parent Company and/or successor Company);**

62. The Plaintiffs repeat and realJage the allegations set forth in paragraphs A1" through A61" as if more fully set forth herein.

63. The Plaintiffs aver that the Defendants' unlawful and discriminatory treatment of them on account of their gender with regard to terms, conditions and privileges of employment violated the provisions of Title VII of the Civil Rights Act of 1964 as amended, 42 U.S.C.A 2000(e) et. seq.

64. By reason of the Defendants unlawful actions, the Plaintiffs are entitled to damages, including but not limited to, lost compensation, lost pay, and benefits based on failure to promote, front pay in an amount to be determined by the court, pain and suffering, emotional distress, and punitive damages in the sum to be determined by a jury, with interest, costs and disbursements; and in addition, attorneys= fees.

## AS AND FOR A THIRD FEDERAL CAUSE OF ACTION
## FOR EMPLOYMENT DISCRIMINATION DUE TO RETALIATION
### against

**SPECTRUM COMMUNITIES; WCI COMMUNITIES (as parent Company and/or successor company); WCI/SPECTRUM COMMUNITIES(as parent Company and/or successor Company);**

65. Plaintiffs' repeat and realleges each and every allegation set forth in paragraphs A1" through A64" with the same force and effect as if stated more fully herein.

66. The defendants discriminated against Plaintiffs' based upon their sex, and their opposing discriminatory conduct under Title VII of the Civil Rights Act of 1964, 42 U.S.C. '2000(e). Defendants subjected Plaintiffs' to ongoing sexual harassment and retaliated against them by constructive discharge in terminating their employment when they sought to address the pervasive hostile work environment.

67. By engaging in the above-described conduct, the defendants discriminated against Plaintiffs'with malice or reckless indifference to their federally protected rights. Accordingly, Plaintiffs' have suffered and are entitled to damages, including but not limited to, lost compensation, lost pay and benefits, front pay in an amount to be determined by the court, pain and suffering, mental anguish and other emotional distress damages, punitive damages, costs and attorney=s fees, and pre-judgment interest in an amount to be determined by a jury.

## AS AND FOR A FOURTH FEDERAL CAUSE OF ACTION
## FOR HOSTILE WORK ENVIRONMENT

### against

**SPECTRUM COMMUNITIES; WCI COMMUNITIES (as parent Company and/or successor company); WCI/SPECTRUM COMMUNITIES(as parent Company and/or successor Company);**

68.   The Plaintiffs repeats and realleges the allegations set forth in paragraphs A 1" through A67" as if more fully set forth herein.

69.The Defendants', SPECTRUM COMMUNITIES; WCI COMMUNITIES (as parent Company and/or successor company) and WCI/SPECTRUM COMMUNITIES(as parent Company and/or successor Company); have created a hostile work environment against the Plaintiffs in violation of the terms and conditions of their employment in violation of Title VII of the Civil Rights Act, as amended, 42 U.S.C. 2000 et. seq.

70. By reason of the Defendants unlawful actions, the Plaintiffs are entitled to damages, including but not limited to, lost compensation, lost pay, front pay in an amount to be determined by the court, pain and suffering, emotional distress, and punitive damages in the sum to be determined by a jury, with interest, costs and disbursements; and in addition, attorneys= fees.

**AS AND FOR A FIFTH CAUSE OF ACTION FOR SEXUAL HARASSMENT AGAINST
ALL DEFENDANTS
IN VIOLATION OF NEW YORK STATE EXECUTIVE HUMAN RIGHTS LAW**

71.    The Plaintiffs repeats and reallege the allegations set forth in paragraph A1" through A70" as if more fully set forth herein.

72.    The Plaintiffs avers that the Defendants' unlawful and discriminatory treatment of them on account of their sex with regard to the terms, and conditions, of their employment and the unlawful and discriminatory termination and/or constructive discharge and termination of her employment because of their sex violates the provisions of Article 15 of the New York State Executive Law, specifically Executive Law '296 and '297, justifying an award, <u>inter alia</u>, of back pay, benefits, and compensatory damages in a sum to be determined by a jury, with interest, costs and disbursements and attorneys fees.

**AS AND FOR A SIXTH CAUSE OF ACTION AGAINST ALL DEFENDANTS IN
VIOLATION OF NEW YORK STATE EXECUTIVE HUMAN RIGHTS LAW
FOR GENDER DISCRIMINATION**

73. The Plaintiffs repeat and reallege the allegations set forth in paragraphs A1" through A72" as if more fully set forth herein.

74. The Plaintiffs aver that the Defendants= unlawful and discriminatory treatment of them on account of their gender with regards to the terms, conditions and privileges of employment violated the provisions of the New York State Executive Law, specifically Executive law '296 and '297 justifying an award, inter alia of back pay, benefits, compensatory damages for emotional distress against the defendants in an amount to be determined by a jury along with interest, costs, and disbursements.

## AS AND FOR A SEVENTH CAUSE OF ACTION AGAINST ALL DEFENDANTS IN VIOLATION OF NEW YORK STATE EXECUTIVE HUMAN RIGHTS LAW FOR RETALIATION

74. Plaintiffs repeats and realleges each and every allegation set forth in paragraphs A1" through A73" with the same force and effect as if stated more fully herein.

75. The defendants engaged in unlawful activity when they retaliated against Plaintiff=s by terminating their employment due to their opposing sexual harassment.

76. As a result, the defendants conduct violated the provisions of Article 15 of the New York State Executive Law, specifically section 296 , justifying an award, inter alia, of

back pay, benefits, and compensatory damages in a sum to be determined by a jury, with interest, costs and disbursements.

### AS AND FOR AN EIGHTH CAUSE OF ACTION
### FOR NEGLIGENT RETENTION OF EMPLOYEES
### AGAINST
**AGAINST SPECTRUM COMMUNITIES; WCI COMMUNITIES (as parent Company and/or successor company); WCI/SPECTRUM COMMUNITIES(as parent Company and/or successor Company)**

77. The Plaintiffs repeats, reiterates and reallege the allegations contained in paragraphs "1" through "76" as if more fully set forth herein.

78. The Defendants' had a duty to take reasonable measures to safeguard its employees against harassment by other employees and/or principals.

79. The Defendants, upon information and belief, had actual notice of the harassment and acts as set forth herein, and failed to act in a reasonable and prudent manner to prevent such happenings from occurring.

80. The Defendants, were negligent, careless and reckless in failing to prevent the ongoing pervasive harassment of the Plaintiffs. As a result, the Plaintiffs have been damaged in a sum to be determined by a jury at trial, with interest, costs and disbursements.

## AS AND FOR A NINTH CAUSE OF ACTION BASED UPON
## THE THEORY OF UNDER RESPONDEAT SUPERIOR
### AGAINST

**AGAINST SPECTRUM COMMUNITIES; WCI COMMUNITIES (as parent Company and/or successor company); WCI/SPECTRUM COMMUNITIES(as parent Company and/or successor Company)**

81.  The Plaintiffs repeats and realleges the allegations set forth in paragraphs A1" through A83" as if more fully set forth herein.

82.  The Defendants are liable to Plaintiffs for the acts of its Administrators, supervisors, managers and other agents or employees under the theory of Respondeat Superior in that the Defendants owns and/or funds and/or controls and/or supervises the acts of its administrators, supervisors, managers, employees and agents.

83. The acts undertaken by the supervisors, managers, employees and agents of the Defendants, were committed during the scope of their employment.

## AS AND FOR A TENTH CAUSE OF ACTION BASED UPON
## THE THEORY OF AIDER AND ABETTOR UNDER SECTION 296.6
## OF THE NEW YORK STATE EXECUTIVE LAW

84. The Plaintiffs repeat and reallege the allegations contained in paragraphs A1" through A83" as if more fully set forth herein.

85. That the foregoing acts plead above were aided and abetted by, and with the full knowledge and consent, of the individually named defendants in violation of Section 296.6 of the New York State Executive Law.

86.    As a result of the Defendants actions, the Plaintiffs suffered economic losses, mental anguish, pain and suffering. Defendants actions violated the provisions of the New York State Executive Law, specifically Executive law '296.6 justifying an award, inter alia of back pay, benefits, compensatory damages for emotional distress against the defendants in an amount to be determined by a jury along with interest, costs, and disbursements.

## AS AND FOR AN ELEVENTH CAUSE OF ACTION
## FOR CONSTRUCTIVE DISCHARGE

87. The Plaintiffs repeat and reallege each and every allegation in paragraphs A1" through A86" of the  Complaint with the same force and effect as if set forth herein.

88. The Defendants, by their unlawful actions as set forth above, intentionally attempted to make, and did in fact make, the working conditions of the Plaintiffs intolerable.

89. The Plaintiffs working conditions as created by the Defendants' actions were not only subjectively intolerable to the Plaintiffs themselves, but were also made objectively

intolerable by the actions of the Defendants, in that a reasonable person in Plaintiffs position would have felt compelled to resign , and would in fact have been justified in resigning their employment under these circumstances.

90. Indeed, under the deplorable conditions purposefully created by the Defendants' actions, the Plaintiff had no other alternative but to resign their employment with the defendant in order to preserve their health and safety.

91. The actions and inactions taken by the defendants herein were taken with the specific intention of forcing the Plaintiffs to resign their employment.

92. As a result of the defendants purposeful behavior the Plaintiffs suffered economic loss and emotional distress damages and were other wise greatly aggrieved.

## PRAYER FOR RELIEF

**WHEREFORE**, the Plaintiffs respectfully prays for judgment against the Defendants as follows:

(a) an award to the Plaintiffs, under Title VII, of all of the back pay, front pay and fringe benefits that they have lost as a result of the Defendants' unlawful discrimination against Plaintiffs, together with interest;

(b) an award to the Plaintiffs, under Title VII, of compensatory and punitive damages in an amount to be determined by a jury at trial, with interest, costs and disbursements;

(c)    an award to the Plaintiffs under 42 U.S.C. ' 2000e-5(k), of reasonable attorneys' fees and the costs of this action;

(d) an award to the Plaintiffs, under New York State Executive Law  §§ 296 and 297, of a money judgment representing back pay, and other employment benefits, together with interest on said amounts, and other compensatory damages in an amount to be determined by a jury at trial, with interest, costs and disbursements;

(e) a money judgment representing back pay, and other employment benefits, together with interest on said amounts, and other compensatory damages in an amount to be determined by a jury at trial, with interest, costs and disbursements for retaliatory conduct in violation of the New York State Human Rights law '296.

(f) an award to the Plaintiffs of a sum to be determined by a jury at trial, with interest, costs and disbursements on the Eighth Cause of Action;

(g) an award to the Plaintiffs of a sum to be determined by a jury at trial, with interest, costs and disbursements on the Ninth State Cause of Action;

(h) an award to the Plaintiffs of a sum to be determined by a jury at trial, with interest, costs and disbursements on the Tenth State Cause of Action.

(j) an award to the Plaintiffs of a sum to be determined by a jury at trial, with interest, costs and disbursements on the Eleventh Cause of Action.

(k) That the Court retain jurisdiction over this action until the Defendants have fully complied with the Orders of the Court and that the Court require the Defendants to file such reports as may be necessary to supervise such compliance; and

(l) To award Plaintiffs such other and further relief as this Court deems just and proper.

## JURY DEMAND

Plaintiffs herein demand a trial by jury of all issues in this action.

Dated: Garden City, New York
        February 11, 2005

Respectfully submitted,

ROBERT H. SPERGEL (RS 9007)
Attorney for the Plaintiffs
320 OLD COUNTRY RD
Suite 105
Garden City, New York 11530
(516)535-4311

## VERIFICATION

STATE OF NEW YORK    }
                        }  ss.:
COUNTY OF NASSAU    }

Jennifer Barna, being duly sworn, says:

I am the Plaintiff in the within action.  I have read the foregoing Summons and Complaint and know the contents thereof; the same is true and correct to my own knowledge, except as to matters therein stated to be alleged on information and belief, and as to those maters, I believe them to be true.

Jennifer Barna
—————————————
Jennifer Barna

Sworn to before me this 5th

Day of February 2005

ROBERT H. SPERGEL
Notary Public, State of New York
No. 02SP5072354
Qualified in Nassau County
Commission Expires January 27, 2007

## VERIFICATION

STATE OF NEW YORK    }
                     }   ss.:
COUNTY OF  NASSAU    }


Jennifer Horn., being duly sworn, says:

I am the Plaintiff in the within action.  I have read the foregoing Summons and

Complaint and know the contents thereof; the same is true and correct to my own

knowledge, except as to matters therein stated to be alleged on information and belief,

and as to those maters, I believe them to be true.


_____
Jennifer Horn


Sworn to before me this 5th

Day of February 2005

ROBERT H. SPERGEL
Notary Public, State of New York
No. 02SP5072354
Qualified in Nassau County
Commission Expires January 27, 2007